**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | | |
|---|---|---|
| JOHN DOE, | ) | |
| | ) | Case No: |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| FLORIDA COLLEGE, INC., d/b/a | ) | |
| Florida College | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FLORIDA COLLEGE BOARD OF | ) | |
| DIRECTORS | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MIKE BENSON, | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN WEAVER, | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| TODD CHANDLER, | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BUDDY PAYNE, | ) | |
| 119 N. Glen Arven Ave., | ) | |
| Temple Terrace, Florida 33617 | ) | |
| | ) | |
| and | ) | |

```
                                        )
JOHN ROES 1-5,                          )
                                        )
            Defendants.                 )
```

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
### (Jury Trial Demanded)

NOW COMES Plaintiff, John Doe[1], by and through undersigned counsel, and for his cause of action against the Defendants, Florida College Inc., Florida College Inc.'s Board of Directors, Mike Benson, John Weaver, Todd Chandler, Buddy Payne, and John Roes 1-5 states the following:

## NATURE OF THE ACTION

1.      This action alleges that Defendants failed to take immediate and appropriate steps to investigate sex-based harassment and misconduct, and that Defendants failed to take prompt and effective steps to end the harassment once notice of the misconduct became sufficiently severe so as to deny Plaintiff access to Florida College Inc.'s educational programs and activities, in violation of Title IX of the Education Amendments of 1972 ("Title IX") 20 U.S.C. § 1681 *et seq.* Rather than take appropriate measures to curb and/or stop the alleged misconduct, Defendants compelled Plaintiff to cease his pursuit of his claims, making fraudulent promises that induced Plaintiff into believing the College would sufficiently investigate the matter and punish the offenders after the close of his Title IX matter.

## JURISDICTION

2.      This action is brought pursuant to Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

---

[1] Plaintiff is contemporaneously filing a Motion for Permission to Proceed under Pseudonym. Plaintiff is entitled to proceed anonymously because of the highly sensitive nature of the disciplinary proceedings against him that form the basis of this Complaint, and the fact that the University is fully aware of his identity and will not be prejudiced in any way.

3.      Subject matter jurisdiction is based on 28 U.S.C. § 1331, which grants the district courts' jurisdiction over civil actions arising under the Constitution, laws, and treaties of the United States.

4.      The events giving rise to this lawsuit occurred in Temple Terrace, Florida, which is located in the Middle District of Florida.

5.      Venue is proper in the United States District Court for the Middle District of Florida, pursuant to 28 U.S.C. § 1391 (b)(2), in that this is the judicial district in which the events giving rise to Plaintiff's claims occurred.

## PARTIES

6.      Plaintiff, John Doe, is a natural person who resides in the State of Florida. At all relevant times, John was enrolled as a full-time student at Florida College.

7.      Defendant Florida College Inc., d/b/a Florida College ("Florida College" or "the College") is, and was at all relevant times herein, a private, Christian-based college incorporated under the laws of the State of Florida, located in Hillsborough County, Florida.

8.      Defendant Florida College receives federal funds, for the purpose of establishing Plaintiff's standing to bring this action under Title IX and has its principal place of business at 119 North Glen Arven Avenue, Temple Terrace, Florida.

9.      Defendant Board of Directors is in charge of overseeing Florida College, serving as the College's governing body.

10.     Defendant Mike Benson was at all times relevant to this action an employee of Florida College, serving as Dean of Students.

11.     Defendant John Weaver was at all times relevant to this action an employee of the Florida College, serving as President of Florida College.

12. Defendant Todd Chandler was at all times relevant to this action an employee of Florida College, serving as Title IX Coordinator.

13. Defendant Buddy Payne was at all times relevant to this action an employee of Florida College, serving as Chancellor.

14. Defendants Roes 1-5 were at all times relevant to this action employees of Florida College and they are final policymakers.

## FACTUAL ALLEGATIONS

15. During the Fall Semester of the 2021-2022 academic year, Plaintiff was a freshman student at Florida College. Prior to attending Florida College, Plaintiff attended Florida College Academy, a private K-12 school that prepares students to attend Florida College.

16. Throughout the Fall Semester of the 2021-2022 academic year, Plaintiff was the victim of several acts of sexual misconduct against him and others.

17. Specifically, throughout various times during the semester, several other students, J.H., J.E., J.R. 1, C.A., and T.N. ("the Offenders"), whose identities are known to the College:

    a. Picked the locks of Plaintiff's dorm bathroom and recorded and/or attempted to record Plaintiff while he was taking a shower, without Plaintiff's consent; and

    b. Climbed into Plaintiff's bed while Plaintiff was sleeping and attempted to cuddle with Plaintiff, without Plaintiff's consent.

18. On each occasion, Plaintiff told the Offenders that their conduct was not welcomed and asked them to stop.

19. Plaintiff also removed himself from the group text message chat he was in with the Offenders.

20.     After Plaintiff removed himself from the chat, the Offenders began making fun of and bullying Plaintiff. Specifically, Plaintiff was made aware of several text messages between the Offenders that were disparaging to Plaintiff. When Plaintiff confronted the Offenders about these messages, the Offenders continued to harass Plaintiff.

21.     As a result of the ongoing sexual harassment, Plaintiff suffered severe mental distress and feared for his own safety. As a result, Plaintiff was forced to leave Florida College shortly after the Spring 2022 Semester began.

22.     In July, 2022, Plaintiff expressed his desire to return to Florida College, in an attempt to continue his education.

23.     On August 1, 2022, Plaintiff and his mother met with Holly Cabina, Director of Academic Advising. During this meeting, Cabina asked Plaintiff if his former roommates or suitemates were the reason he withdrew from the College during the previous semester. Cabina asked this question because the Offenders were put on a "watch list," according to Cabina. Cabina did not specify why the Offenders were put on this list, nor did she explain why. Plaintiff responded in the affirmative, and notified Cabina that he was the victim of sexual harassment during the previous school year. Plaintiff explained the actions the Offenders took towards him and other students, and explained that he left the College because he did not feel safe. At the conclusion of the meeting, Cabina notified Plaintiff that she would contact Defendant Mike Benson, Dean of Students, about the allegations.

24.     On August 17, 2022, Plaintiff's sister sent Benson an email requesting a meeting with him. Later that day, Plaintiff's sister met with Benson to discuss Plaintiff's allegations and the sexual harassment he had been subjected to, as well as what she knew about the other instances

of misconduct towards other students by the Offenders, which created a pervasive atmosphere of sexual harassment and misconduct on campus.

25.     On August 19, 2022, Plaintiff reenrolled at Florida College for the 2022-2023 academic school year, and moved back to campus.

26.     On August 22, 2022, Plaintiff's mother met with Cabina,. Benson, and J.R.2's mother. In this meeting, J.R. 2's letter, which was previously sent to Ms. Cabina via email, was discussed. J.R. 2's letter corroborated Plaintiff's complaints about the Offenders, as well as notified the College of his own experience being sexually harassed by the Offenders. However, J.R. 2 alerted the College that he did not wish to seek a formal complaint. J.R. 2's mother requested that the locks on the bathroom doors be changed, in an effort to stop the Offenders from picking the locks again. This request was never fulfilled, as Florida College continued to allow the Offenders unfettered access to campus and the bathrooms.

27.     During the August 22, 2022 meeting, Benson stated that he had personally spoken to V.G., who admitted that he had violated Florida College policy involving sexual misconduct. Cabina verbally told Benson what was contained in J.R. 2's letter. Plaintiff's father later gave Benson a copy of the letter. Benson informed Plaintiff's mother that this matter would be discussed with Todd Chandler, Florida College's Title IX Coordinator, as the allegations may invoke the College's obligations under Title IX. At the conclusion of the meeting, Benson informed Plaintiff's mother that one of the Offenders, not named above, had already been banned from campus for conduct similar to that which Plaintiff experienced. However, Florida College took no steps to enforce this Offender's prohibition from campus, and the offender was often seen on campus and at campus events.

28.     On August 25, 2022, Plaintiff sent an email to Benson and Chandler requesting that his seat in chapel be moved, as he was not comfortable sitting so close to the Offenders. Plaintiff's seat was subsequently moved, though this did not alleviate the stress and anxiousness being in his Offender's presence caused him.

29.     On August 25, 2022, Chandler sent an email to Plaintiff requesting a meeting with Plaintiff to discuss the allegations.

30.     On August 29, 2022, Plaintiff informed Chandler that he wished to file a formal complaint against J.H., J.E., J.R., C.A., and T.N. for sexual harassment and sexual misconduct. Specifically, Plaintiff alleged that J.H. and J.E. filmed Plaintiff in the shower without his consent or permission.

31.     Pursuant to Title IX and its implementing regulations, this email prompted the College to promptly respond, which included, but was not limited to, opening an investigation into the matter.

32.     Both Title IX and the College's Sexual Harassment, Discrimination, and Misconduct Policy allow the Title IX Coordinator to sign a formal complaint on behalf of a potential complainant, even when the complainant does not make the report themselves.

33.     On August 30, 2022, Chandler sent a letter to J.H. and J.E., notifying them that they have been named in a formal complaint alleging a possible Title IX violation. Specifically, the letter notified them that it was alleged that Plaintiff filed the complaint and accused the boys of "participation in taking pictures/videos of [Plaintiff] while he was in the shower, on more than one occasion, without his consent, and after he stated he did not want that to happen."

34.     The other Offenders were never named in any complaint, despite the fact that they were named in Plaintiff's email to Chandler.

35.     Upon information and belief, Chandler never signed a formal complaint on behalf of J.R. 2, despite having actual knowledge of alleged sexual harassment.

36.     Defendants did not notify Plaintiff that a formal investigation was launched.

37.     Shortly after the Title IX Complaint was filed, Defendant Payne was contacted by Plaintiff's grandfather. Payne opined that it is never good when the government gets involved, discussed the impact these matters can have on the school's federal funding, and insinuated that these matters are better dealt with by the College itself, rather than through Title IX, which has certain reporting requirements. These same and/or similar comments were shared with Plaintiff's father in a subsequent meeting he had with Payne.  In reality, Defendants did not want Plaintiff to proceed with his Title IX Complaint, as it would complicate the College's efforts to cover up the Offender's behavior. Specifically, the College sought to avoid categorizing these incidents as "sexual misconduct," which would have triggered reporting requirements. This, in turn, would allow the College to continue to market itself as a College that admits students with strong Christian beliefs and morals, as opposed to a school with a history of sexual misconduct, a label that would jeopardize donations and funding for the College, as well as harm the College's recruitment efforts of new students/families.

38.     Avoiding categorizing these incidents as "sexual misconduct" would allow the school to avoid suspending the Offenders under its own policies, thus negating the need to explain to donors and families why students were being removed from campus.

39.     Following the formal complaint letter, Plaintiff's parents and grandfather met with Defendant Weaver, President of Florida College, and Benson. During this meeting, Plaintiff's parents expressed frustration with Defendants efforts in remedying the situation. Plaintiff's parents also discussed that their primary goals in the Title IX process was to keep Plaintiff and other

students safe. Plaintiff and his family were especially concerned with the ease in which the Offenders were able to break into bathrooms to video tape nude students, as well as the fact the College had taken no steps to provide better security for the bathrooms, despite being aware of the allegations.

40.    Plaintiff's parents asked why Defendants were refusing to take action against the Offenders for their conduct, which included misconduct towards Plaintiff, as well as J.R. 2. Weaver and Benson told Plaintiff's parents that Chandler had not decided to initiate proceedings related to the misconduct J.R. 2 received and observed because Mr. Chandler considered these actions to be part of Plaintiff's Title IX Complaint. During this meeting, Plaintiff's parents were led to believe that Chandler's investigation was all encompassing of each and every allegation of sexual misconduct against both Plaintiff and J.R. 2. In reality, no investigation was being conducted, and to the extent it was, it only focused on Plaintiff being videoed in the shower without his consent. Chandler had no intention of ever pursuing an investigation into J.R. 2's claims, or the allegations that the Offenders were engaged in other violations of the College's policies.

41.    In the meeting, Weaver and Benson also urged Plaintiff's parents to have Plaintiff withdraw the Title IX Complaint against J.H. and J.E., by misrepresenting that the College's disciplinary committee could handle things much quicker and more effectively than via a regulated Title IX process. Essentially, Defendants Weaver and Benson reiterated the same sentiment Defendant Payne made towards Plaintiff's grandfather. Through these misrepresentations, Plaintiff and his parents were led to believe that Defendants sought to protect Plaintiff, that they believed Plaintiff, and that the Offenders would be sufficiently punished, in accordance with the College's Handbook for sexual misconduct, if Plaintiff gave up his rights under Title IX.

42.     Pursuant to the College's Handbook, sexual misconduct of any kind is considered a "Category III" violation, and triggers an automatic suspension from the College.

43.     In making these material misrepresentations, Defendants improperly and unduly persuaded Plaintiff to waive his rights under Title IX, and proceed under a process that was governed by the College and the College alone. Unbeknownst to Plaintiff and his parents, this would allow the College to more easily control the process to come to a determination the College deemed fit, while being able to conceal the disciplinary process and circumvent the protections Plaintiff should have had via the Title IX process under federal law.

44.     Throughout the meetings with Plaintiff and/or his family, Defendants made several material misrepresentations, all under the guise of giving support to Plaintiff. In reality, Defendants intentions were to protect the image of the College and to sweep any behavior that could be viewed as sexual misconduct between male students or otherwise contrarian to their idea of Christianity under the rug, so that it would not become public knowledge. These misrepresentations included, but were not limited to:

a.   Stating that all information gathered, including information about the other Offenders and the allegations involving J.R. 2 and V.G. would be turned over to the disciplinary committee;

b.   Stating that the disciplinary committee process could handle things much quicker and effectively compared to the Title IX process; and

c.   Assuring that Plaintiff was being believed and that the Offenders would be dealt with and/or punished in an appropriate manner.

45.     After relying on these material misrepresentations and experiencing unnecessary delays, Plaintiff stated that he wished to explore informal resolution. Chandler told Plaintiff to

write his request in an email, which Plaintiff sent on September 14, 2022.

46.     When discussions of informal resolution began, Plaintiff and his family notified Chandler that they were only interested in informal resolution to the extent the boys admitted their violations of sexual misconduct, and sufficient sanctions were imposed, in accordance with the College Handbook.

47.     On September 22, 2022, Chandler initiated the informal resolution process. From then on, Defendants kept Plaintiff and his family uninformed of the process, in violation of College policies and procedures.

48.     Whenever Plaintiff's parents asked for an update, Defendants advised them that they were not going to discuss it. Throughout the process and in the aforementioned meetings, Plaintiff's parents were repeatedly discouraged from talking about the matter to others. In doing so, Defendants, in essence, put a gag order on Plaintiff and his family, despite its own repeated violations of the Family Educational Rights and Privacy Act.

49.     Plaintiff and his parents repeatedly requested that Plaintiff be supported throughout the process, and notified Defendants that several students were spreading lies about Plaintiff and making him feel unwelcome and unsafe on campus. These allegations of retaliation fell on deaf ears, as Defendants took no steps to provide reasonable support, accommodations, or other relief, nor did they investigate any of these claims, despite the fact that retaliation is a violation of Title IX and the College's own policies.

50.     Throughout the process, Defendants repeatedly told Plaintiff and his family that Plaintiff was credible, that they believed he was telling the truth, and assured Plaintiff and his parents that this matter would be handled in accordance with College policies. Plaintiff was repeatedly told to trust the process and trust Defendants, whom he had grown up with and knew

the overwhelming majority of his life.

51.     In the fall of 2022, Chandler spoke to Plaintiff's father and informed him that a prior student had been accusing Plaintiff of threatening the Offenders. In response to the allegations, Mr. Chandler suspended Plaintiff from staying in the dorm rooms, despite the clear motive for false allegations, despite the fact that no evidence existed to corroborate this claim, and absolutely no investigation being conducted.

52.     When Plaintiff's father asked Chandler who made the claim, Chandler declined to answer, despite Chandler notifying the Offenders that Plaintiff made the Title IX claims against them. Eventually, Chandler released the accuser's name, after Plaintiff's parents notified Chandler of this differential treatment. After learning of the accuser's name, Chandler was informed of her credibility issues. Chandler acknowledged that he was already aware of the accuser's issues. Plaintiff also informed Chandler of a relevant witness, who could unequivocally absolve Plaintiff.

53.     Days later, after receiving no follow-up from the College, Plaintiff's father called Chandler. Chandler informed Plaintiff's father that the accuser had stuck by her story. Plaintiff's father requested that Chandler ask for specific information about the alleged threats, which could establish Plaintiff's innocence. Chandler told Plaintiff's father that he would continue to investigate.

54.     Days later, after receiving no follow-up again, Plaintiff's father called Chandler for an update. Chandler told Plaintiff's father that he had not had the time to "deal with it." All the while Plaintiff was banned from staying on campus due to a false allegation.

55.     After the phone call, and after several days of  Plaintiff's ban from staying on campus due to a baseless accusation, Chandler finally spoke with the accuser, as well as the witness provided by Plaintiff. Chandler came to the determination that the accuser was not a credible

witness and that her statement was false. Plaintiff's suspension, which should have never occurred in the first place, was lifted.

56. After the accusations were discredited, Plaintiff requested a meeting with Chandler. During this meeting, Chandler told Plaintiff that he believed that Plaintiff had been the victim of sexual misconduct, and told Plaintiff about his own personal trauma. This was shared with Plaintiff in further effort to coax Plaintiff into trusting that Chandler and the other Defendants had Plaintiff's best interest in mind.

57. On or about October 5, 2022, Plaintiff accepted the proposed informal resolution. Plaintiff's decision to do so was entirely predicated on Defendant's previous assurances that the College would handle this matter effectively by way of the disciplinary committee; that Defendants believed Plaintiff was telling the truth, thereby making Plaintiff believe that the Offenders would be further investigated and disciplined consistent with College policy; and Defendants' regular pressure towards Plaintiff to resolve his Title IX complaint. Pressure improperly applied to Plaintiff's family contributed to the acceptance of an informal resolution.

58. Unbeknownst to Plaintiff, Defendants had no intention of taking this matter seriously, or viewing the Offender's conduct as sexual in nature, as Defendants sought to protect the College's community "values" and the perception of its donors. Instead, Defendants met with the charged Offenders, and after one meeting, found them responsible for "disorderly activity deemed by the Dean of Students to create a hazard for the Florida College community." Upon information and belief, the Disciplinary Board was never provided the full scope of information related to the allegations made by Plaintiff. The committee was also never notified of the other instances of sexual misconduct involving J.R. 2, V.G., or the Offenders engaging in conduct that

violated College policies.  Instead, the Board was provided only enough information to justify a small, non-sex related infraction, warranting minimal punishment.

59.     Defendants coerced Plaintiff into accepting informal resolution so they could then sweep the behavior of the Offenders under the rug. Defendants took no steps to remedy the sexual harassment and discrimination within its educational system, in violation of federal law.

60.     In doing so, Defendants were also able to promote the false narrative that the actions of the Offenders was not sexual misconduct or sexual in nature, thus furthering the College's goal of sweeping sexual misconduct under the rug and out of the eyes of donors.

61.     On October 24, 2022, Plaintiff's mother sent an email to Benson and Weaver requesting an update on the matter.

62.     The following day, Benson responded, "Hi [], thanks for checking in. It is being worked on and we are in the process of questioning some of the different parties. We hope to have things resolved soon." Upon information and belief, this questioning was not being done. To the extent it was, Benson never had any intention of using the information in any meaningful way to fulfill the College's obligations under Title IX and its own policies.

63.     On October 27, 2022, Plaintiff's father went to Florida College to ask for an update. He spoke to Weaver, who, when asked for an update, became defensive and would not answer questions. Plaintiff's father again expressed his concern that no one from the College had attempted to contact or support Plaintiff during the investigation. In response, Weaver stated that he was not permitted to speak with Plaintiff because the Title IX investigation was resolved.

64.     During this meeting, Plaintiff's father informed Weaver that Plaintiff would be withdrawing from Florida College because he was being victimized daily through rumors and false statements, was being unsupported by College personnel, and because the College was not

handling the sexual misconduct allegations according to its own polices, federal law, or its own promises to Plaintiff and his family. Weaver then asked to speak to Plaintiff in an effort to change his mind, despite his previous assertion that he was not permitted to speak to Plaintiff.

65.     Later that night, Benson called Plaintiff's father, and, when asked for information, refused to answer questions from Plaintiff's father, stating that any updates were confidential. Benson also admitted that despite being asked to provide support and accommodations to Plaintiff, he never attempted to contact Plaintiff.

66.     Days later, Plaintiff received an email from Weaver requesting a meeting. Plaintiff agreed. At the meeting, Weaver asked Plaintiff to remain a student. Weaver continued to tell Plaintiff that he believed that Plaintiff was being truthful, and asked Plaintiff what he would like to happen to the Offenders. Plaintiff expressed that he wanted to feel safe and comfortable on campus, and he could not do so if the Offenders were still permitted to be in the dorm rooms and allowed unfettered access to the campus, including the Starbucks on campus, which Weaver acknowledged as the "central hub of the campus." Weaver further acknowledged that Plaintiff did not feel comfortable going to the Starbucks because some of the Offenders worked there. Weaver was unwilling to commit to any corrective action or reasonable accommodation.

67.     Shortly thereafter, Plaintiff withdrew from Florida College, as Defendants had continuously refused to provide any supportive measures, uphold their own promises, or complete an appropriate investigation.

68.     After Plaintiff left the College, Defendants took no further steps to investigate his claims or to take additional corrective action against the Offenders, despite having an obligation to do so.

15

69.     In late November, 2022, Plaintiff's sister and father met with Benson and expressed her concern that the Offenders were allowed to remain on campus, while Plaintiff was essentially forced to leave.

70.     On November 20, 2022, Plaintiff's sister sent Weaver an email and attached J.R. 2's eye-witness statement that the Offenders were taking pictures of V.G.'s penis and a screenshot of the text thread wherein J.H. admitted to taking pictures of V.G. Cabina, Chandler and Benson were also included on this email.

71.     On November 21, 2022, Plaintiff's sister emailed Mr. Lee Quinn a copy of the letter sent to Weaver on November 20, 2022. Mr. Lee responded stating that because he was a member of the disciplinary committee, he could not discuss details of the matter. However, Mr. Lee admitted that he had not been made aware of several other instances of sexual misconduct and opined that "red flags" were going off.  Mr. Lee also called Plaintiff's parents stating his concerns, just as he had done with Plaintiff's sister.

72.     On November 21, 2022, Weaver emailed Plaintiff's sister and scolded her for emailing Mr. Lee, furthering Defendants retaliation against Plaintiff and his family.

73.     On November 22, 2022, Weaver's secretary emailed Plaintiff's sister requesting a meeting between Plaintiff's sister and Weaver. Plaintiff's sister agreed and notified Weaver that her father and Mr. Lynn Wade would be attending the meeting with her.

74.     Also on November 22, 2022, Benson replied to Plaintiff's request for a meeting, stating that due to privacy laws, he would not be able to provide many details while Mr. Wade is present. Plaintiff was never advised that a FERPA release could be signed, which would allow Benson to speak freely in front of Mr. Wade.

75.     On November 29, 2022, Plaintiff's father and sister met with Weaver, Benson, and

16

Wade. In this meeting, Weaver opined that Defendants handled the situation appropriately, and dismissed Plaintiff's concerns about the way in which the College handled the case. Plaintiff's father asked why the Offenders were not found responsible for sexual misconduct, to which Benson and Weaver stated that the term sexual misconduct was too vague, and the College would be revising its handbook. Defendants refused to give any details about what their "investigation" entailed, the facts learned throughout the course of the investigation, or the result of the investigation. In this meeting, Weaver also accused Plaintiff's sister of slander.

76.     On December 2, 2022, Plaintiff, his father, and Mr. Wade met with Benson. Plaintiff asked Benson why this matter was not investigated and resolved properly or timely. Benson replied, "things happened." During the meeting, Plaintiff asked why none of his eyewitnesses were ever contacted, to which Benson falsely stated that he did attempt to reach out to the witnesses. Plaintiff also asked Benson why he did not find the hidden picture of V.G. when it was easily found by the students who moved into the same dorm room and currently live there. Plaintiff also told Benson that J.H. had been heard by many students to have stated that it was his goal to have pictures of every male student's penis by the end of the year.

77.     Also on December 2, Plaintiff's mother discussed this matter with the mother of H.L., one of Plaintiff's eyewitnesses, wherein she was informed that Benson never attempted to interview H.L. regarding the situation.

78.     On December 5, 2022, Benson finally scheduled a meeting with H.L.

79.     In December, 2022, Florida College's Starbucks made a post on Instagram highlighting its employees including the Offenders. Plaintiff commented on the post regarding Florida College's lack of response and punishment towards his Offenders. Plaintiff's comment was removed, and his account was blocked from the student run page.

80.     On December 12, 2022, Plaintiff's sister made a post on her personal Instagram account criticizing Defendants for their cavalier attitude about the sexual harassment Plaintiff was subjected to and their deficiencies in protecting Plaintiff.

81.     Shortly after the post, Weaver contacted Plaintiff stating that he was checking in on him and asking to pray for him.

82.     On December 13, 2022, Benson requested a meeting with Plaintiff because there had allegedly been new information received.

83.     Later that day, Benson sent a follow-up message to Plaintiff and apologized for what occurred with Starbuck's student employee run social media account. Benson told Plaintiff that he was now unblocked from the page, indicating that Defendants had control over the account.

84.     A meeting between Benson and Plaintiff was eventually scheduled for December 21, 2022.

85.     On December 20, 2022, Benson emailed Plaintiff to cancel the meeting the next day. In doing so, Benson provided Plaintiff with two options: 1) reschedule the meeting for a few weeks, or 2) Plaintiff could put all his thoughts and concerns in writing, and it would be distributed to the disciplinary committee.

86.     A meeting between Plaintiff and Benson never occurred. Likewise, Plaintiff was never notified about what "new information" was discovered. Upon information and belief, Defendants took no further action against the Offenders.

87.     On January 19, 2023, Plaintiff's sister sent an email to Defendants, notifying them that J.H., one of the Offenders, had been asking patrons of Starbucks whether they are friends with Plaintiff's family because Plaintiff and his family are "liars." Again, such a claim is a violation of Florida College policies prohibiting retaliation.

18

88.     On February 4, 2023, Weaver emailed Plaintiff's grandfather requesting a telephone conference to discuss an update on the disciplinary process.

89.     On February 10, 2023, Weaver spoke to Plaintiff's grandfather via telephone. Mr. Weaver told Plaintiff's grandfather that information concerning the disciplinary process was confidential but assured him that the Respondents were disciplined in November, 2022. Weaver did not give any details about said punishment. Weaver also denied that H.L. reported that she saw any video of the boys in the shower.

90.     On February 11, 2023, H.L. confirmed that she told Benson that she witnessed the aforementioned video.

91.     As a direct result of Defendants' actions, Plaintiff has been forced off campus, as Defendants have refused to provide him any accommodations, making it unsafe for him to be on campus.

92.     Defendants have failed to adhere to Title IX and other federal law and failed to adhere to its own polices.

### *Florida College's Culture and Policies*

93.     At the heart of Florida College's culture is the Bible and Christianity. The College's "about" page on its website states, "Located in Tampa, Florida College is a private liberal arts school with a goal of providing higher education with a biblical perspective." https://floridacollege.edu/about/

94.     The Bible and other Christian teachings serve as the guideposts for Florida College's policies, which governs student behavior and the standard in which the College holds its students and staff.

95.     The first page of the Student Handbook reads, "Make Me a Servant," which is a reference to the students being a servant of Christ. *See* Student Handbook attached hereto as *Exhibit A*.[2]

96.     In Defendant Benson's welcome letter, he writes, "our Code of Conduct is based on Biblical principles and is designed for the benefit of every student." *Id.* at p. 4. Defendant's Benson's welcome continues to quote various Bible verses. *Id.*

97.     Florida College's mission statement reads, "Florida College, as a private, independent liberal arts college, provides a comprehensive college experience designed to develop students spiritually, mentally, physically, and socially; to integrate into the students' lives the Bible as the revealed will of God; and to prepare students for lives of service to their Creator and to humanity." *Id.* at p. 5.

98.     The goal of the College is to help students grow as Christians. In doing so, the College markets itself as an institution that demands that its students and staff uphold the values contained in the Bible, and the College's interpretation thereof.

99.     Since its inception, the College has used this marketing brand to attract donors who wish to further the College's goal, as well as prospective students, and parents wish to provide their children with a Christian-based education. As such, donors give funding to the College with the expectation that the College is furthering the teachings of the Bible and ensuring that all students are living in accordance with those values. Likewise, parents of incoming students pay tuition and send their children to the College with the same expectation.

100.    Within the Code of Conduct contains various subsections, containing the rules and

---

[2] The version of the Handbook attached is from the 2022-2023 academic year. Upon information and belief, the relevant handbook from the 2021-2022 academic year was the same or substantially similar.

standards students are expected to uphold. These rules, in large part, are predicated on teachings from the Bible, which mold the way in which students are expected to act and live. Living in sin is a direct contradiction to the Code of Conduct.

101.    For example, one subsection is titled "Purity in Relationships," "Students are expected to maintain their moral integrity within personal relationships. Sexual relationships of any type outside of marriage as defined in Scripture (Gen. 2:18–24) are not tolerated." *Id.* at p. 9.

    a.  Genesis 2:18-24, quoted within the policy, states "The Lord God said, 'It is not good for the man to be alone. I will make a helper suitable for him.' Now the Lord God had formed out of the ground all the wild animals and all the birds in the sky. He brought them to the man to see what he would name them; and whatever the man called each living creature, that was its name. So the man gave names to all the livestock, the birds in the sky and all the wild animals. But for Adam no suitable helper was found. So the Lord God caused the man to fall into a deep sleep; and while he was sleeping, he took one of the man's ribs and then closed up the place with flesh. Then the Lord God made a woman from the rib he had taken out of the man, and he brought her to the man. The man said, 'This is not bone of my bones and flesh of my flesh; she shall be called woman, for she was taken out of a man.' That is why a man leaves his father and mother and is united to his wife, and they become one flesh."

    https://www.biblegateway.com/passage/?search=Genesis%202%3A18-24&version=NIV

    b.  Genesis 2:18-24 is generally acknowledged by those within the College, including the administration, as precluding homosexuality, thereby making homosexuality

immoral pursuant to the College's standards.

102.    The "Purity in Relationships" subsection also prohibits "inappropriate physical contact that is sexually sensual, whether on or off campus. *Exhibit A* at p. 9-10.

103.    As a general rule, Florida College prohibits relationships and acts of intimacy that their interpretation of Christianity deems immoral, such as homosexual acts and relationships.

104.    At one point, Defendant Payne told Plaintiff's father that Florida College has a "homosexual problem."

105.    The belief that homosexual acts and/or relationships are immoral, wrong, and should be prohibited is generally accepted by the College.

106.    As a private college, donors are essential to Florida College's funding.

107.    By finding Plaintiff's claims unsupported and not proceeding under Title IX, the College was able to avoid reporting the Offender's conduct as sexual and in doing so sought to protect its own image.

### *Florida College's Sexual Misconduct Policies*

108.    In handling complaints of sexual misconduct that occur on campus, Florida College and its employees are mandated to comply with federal law, including but not limited to Title IX of the Education Amendments of 1972 ("Title IX"), related regulations, and judicial precedent.

109.    Defendants were also bound to follow the College's own procedures and promises, including the provisions of its Student Code and its Sexual Harassment, Discrimination, and Misconduct Policy, ("the Policy") attached hereto as *Exhibit B*.

110.    At the time of Plaintiff's complaint, the Policy supplied the definition of sexual harassment, which was applied to the charges against J.H. and J.E. Specifically, as applied to Plaintiff's Complaint, sexual harassment was defined as "any unwelcome conduct that a

reasonable person would determine is so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the College's educational program or activity." *See Exhibit B* at p. 7.

111.    After receiving a complaint or allegation of sexual misconduct, including sexual harassment, the College and its staff was obligated to follow the procedures set forth by Title IX and its implementing regulations, such as 34 C.F.R. § 106.45, as well as its own policies and procedures.

112.    The Policy outlines the procedures the College must adhere to when resolving allegations of sexual misconduct.

113.    In the "Initial Assessment" subsection, the College promises to, among other things:

      a.   Respond promptly to Title IX sexual harassment in a manner that is not deliberately indifferent. *Id.* at p. 10;

      b.   Promptly contact the complainant to discuss the availability of supportive measures, consider the complainant's wishes with respect to supportive measures, inform the complainant of the availability of supportive measures with or without the filing of a formal complaint, and explain to the complainant the process for filing formal complaint. *Id.* at pp. 10-11; and

      c.   Follow the grievance process of this Policy before the imposition of any disciplinary sanctions or other actions that are not supportive measures, against a respondent. *Id.*

114.    In the "Informal Resolution" subsection, the College promises that, among other things:

a. Before pursuing the Formal Resolution Process, every reasonable effort should be made to constructively resolve conflict. *Id.*;

b. The Title IX Coordinator will facilitate such conversations, upon request, and monitor them for safety. *Id*;

    i. The Policy notes, in accordance with federal law, that informal resolution is voluntary. The College may not coerce, pressure, or force either party to engage in the informal resolution process.

c. The Informal Discussion process will last as long as the Complainant deems it desirable to continue to meet with College officials. *Id.* at p. 12;

    i. 34 C.F.R. § 106.45(b)(1)(v) mandates the College to include reasonably prompt time frames for conclusion of the grievance process, including informal resolution.

    ii. By allowing the "informal discussion" process to last "as long as Complainant deems it desirable," the College's policies do not adhere to federal law.

115. In the "Investigation" subsection, the College promises that, among other things:

a. The Title IX Coordinator will oversee the investigation. Investigations will be completed expeditiously but may take longer depending on their nature or complexity. *Id.*;

    i. By not including reasonably prompt time frames within its polices, the College is in violation of federal law.

b. All investigations will be thorough, reliable and impartial, and will entail interviews with all relevant parties and witnesses, obtaining available evidence and identifying

24

sources of expert information, if necessary. *Id.* at p. 13;

c.  The investigator will take the following steps:

i.  Inform the complainant and respondent of the alleged policy violation and initiation of a formal investigation;

ii.  In coordination with campus partners, initiate any necessary remedial actions;

iii.  Commence a thorough, reliable and impartial investigation by developing a strategic investigation plan, including a witness list, evidence list, intended timeframe, and order of interviews for all witnesses and the respondent; and

iv.  Provide regular updates to both the complainant and respondent, as appropriate, throughout the investigation. *Id.* at p. 13.

d.  The Policy continues to discuss what is required should a Complaint require a hearing and/or appeal.

e.  The College further promises that it is "committed to ensuring that its resolution processes are free from actual or perceived bias or conflicts of interest that would materially impact the outcome." *Id.* at p. 20.

116.  In addition to Florida College's Sexual Harassment, Discrimination, and Misconduct Policy, Florida College also utilizes its Rules, Welfare, and Discipline Committee.

117.  Under Title IX, if sexual misconduct occurs on campus, or within a recipient's education program, the alleged misconduct must proceed in accordance with Title IX's implementing regulations. A recipient is not permitted to impute its own code of conduct policies in substitution to Title IX, but rather, it may only use its code of conduct or other proceedings in addition to Title IX, or when Title IX is not applicable.

118.    As such, sexual misconduct that occurs on campus must adhere to and follow the procedures set forth by Title IX and its implementing regulations. Conversely, sexual misconduct that occurs off-campus or outside the College's educational system must adhere to and follow the procedures set forth in the College's Handbook.

119.    Plaintiff's Complaint alleged sexual misconduct that occurred on Florida College's campus, and only on campus.

120.    As such, Florida College was not permitted, by law, to supplement its own Discipline Committee process in substitution for Title IX.

121.    Almost immediately after receiving Plaintiff's formal complaint, Defendants began pressuring Plaintiff and his family to withdraw the Complaint, so it did not have to proceed under Title IX. Defendants Benson, Weaver, and Chandler, pressured and/or coerced Plaintiff into proceeding with the informal resolution process. Specifically, Defendants told Plaintiff that the Title IX process was not effective, assured Plaintiff that the Offenders would be punished via the discipline committee process and told Plaintiff they believe him and will protect him. Defendants also applied pressure to Plaintiff's family members, which had a significant effect on Plaintiff.

122.    In reality, the College was not in a position to make these promises, as the College was prohibited from proceeding with the discipline committee process because the misconduct occurred on campus and falls within the jurisdiction of Title IX. Moreover, the College was not permitted to issue sanctions after an informal resolution process. When promising to protect Plaintiff, Defendants knew that their goal was not to protect Plaintiff. Instead, their goal was to protect their own image, as well as the College's image in the eyes of its donors and prospective new students by hiding the fact that sexual misconduct among male students was occurring within its purview – which directly opposes its fundamental beliefs.

123.    Upon information and belief, the College also failed to provide supportive measures, including reasonable accommodations, for Plaintiff, failed to treat him and the Offenders equitably, failed to interview relevant parties and/or witnesses, and failed to conduct a thorough and impartial investigation.

124.    The College also failed to ensure that its processes were free from bias and/or conflict of interests. Specifically, Defendant Benson had a conflict of interest as he had personal relationships with several of the Offenders and/or their families.

   a.   Defendant Benson went to church with C.A. and his family, as well as J.E. and his family.

   b.   Defendant Benson also went to the same church as J.R. and his family, is friends with J.R.'s father, and would regularly sit next to J.R.'s father during basketball games.

125.    Rather than recuse himself, Benson played a critical role in pressuring and coercing Plaintiff to agree to informal resolution.

126.    Due to the actions of Defendants and their failure to act in accordance with federal law, the Offenders were never sanctioned, and Plaintiff was forced to leave the College to protect his own safety and mental health.

**COUNT I:**
**Failure To Comply with Title IX**
**20 U.S.C. § 1681 *et seq.***
**(Against All Defendants)**

127.    Plaintiff incorporates all previous paragraphs and allegations as if fully rewritten and replead herein and further state as follows.

128.    This count of Plaintiff's Complaint arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (hereinafter, "Title IX") due to all Defendants'

deliberate indifference to sexual harassment.

129.     This Court has current jurisdiction over Plaintiff's count for violations of Title IX pursuant to *Taffin v. Levit,* 493 U.S. 455 (1990).

130.     Defendant Florida College receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

131.     Title IX prohibits federally funded institutions, such as Defendant Florida College from engaging in discrimination on the basis of sex. Sexual abuse and/or harassment is included within the meaning of "discrimination" under Title IX.

132.     Sexual abuse and/or harassment of a student and/or participant creates a hostile environment if the conduct is sufficiently severe that it denies or limits a student's and/or participant's ability to participate in or benefit from education programs. Here, Plaintiff had to leave the school because of the actions of Defendants, and/or his ability to participate in or benefit from the College's education programs was significantly limited.

133.     Title IX requires schools to promptly investigate student complaints of sexual harassment, and to take interim measures to ensure that its students are not subjected to a hostile education environment. The failure to do so amounts to "deliberate indifference" for which Defendant Florida College may be held liable under Title IX.

134.     Defendants failed to investigate claims of sexual misconduct made by Plaintiff. Rather than investigate Plaintiff's claims, which was accompanied by eye-witnesses and admissions from the Offenders, Defendants responded by pressuring Plaintiff into accepting an informal resolution and giving him false assurances that he would be protected and the Offenders would be sufficiently punished.

135.    Defendants' failures constitute *per se* violations of Title IX and left Plaintiff vulnerable to further sexual harassment that has caused Plaintiff to forgo classroom instruction and extracurricular activities, thereby limiting his ability to participate in, and benefit from, the Defendants' educational programs and activities.

136.    Defendants' Title IX violations also caused Plaintiff pain and suffering, including, but not limited to, humiliation, depression, educational impacts, anxiety, and fear.

137.    Defendants were repeatedly notified of its shortcomings as it relates to its duties under Title IX and still took no affirmative actions to remedy the shortcomings. Rather, Defendants continued to knowingly and purposefully violate federal law and Plaintiff's rights.

138.    As a direct and proximate result of Defendants' violations of Title IX, Plaintiff suffered damages and continues to suffer damages.

139.    As a direct and proximate result of Defendants' violations of Title IX, Plaintiff was deprived of equal access to education opportunities. Plaintiff is entitled to monetary and injunctive relief.

### COUNT II:
### Title IX Retaliation
### 20 U.S.C. § 1681 *et seq.*
### (Against All Defendants)

140.    Plaintiff incorporates all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

141.    Title IX and its implementing regulations prohibit retaliation against any person who complains about what he/she reasonably believes to be a Title IX violation, who advocates on behalf of Title IX rights and enforcement, and any person who cooperates in any investigation of a Title IX violation.

142.     Plaintiff engaged in Title IX protected activity by reporting violations of Title IX, i.e., sexual harassment.

143.     Moreover, Plaintiff's sister participated in Title IX protected activity by reporting instances of sexual harassment and/or retaliation.

144.     Plaintiff and his sister's actions were protected by the anti-retaliation provision of Title IX.

145.     Defendants retaliated against Plaintiff by refusing to take his allegations seriously, failing to provide supportive measures, allowing his perpetrators to be left unchecked, minimizing and diminishing the harassment and its effects, and by banning Plaintiff from campus after malicious and false accusations were lodged against him, all while the College never took immediate action against his perpetrators. Moreover, Defendants retaliated against Plaintiff after the false and malicious allegations against him by refusing to prioritize and investigate these allegations, forcing Plaintiff to spend more time away from campus than required.

146.     Defendants retaliated against Plaintiff's sister by scolding her for reporting instances of sexual harassment and/or retaliation.

147.     Defendants' adverse actions against Plaintiff and his sister were in direct response to, and was in retaliation for, the exercise of their rights under Title IX.

148.     Defendants' adverse retaliatory actions against Plaintiff and his sister violated Title IX and its implementing regulations.

149.     Defendants' retaliation constitutes *per se* violations of Title IX and left Plaintiff vulnerable to further sexual harassment that has caused Plaintiff to forgo classroom instruction and extracurricular activities, thereby limiting his ability to participate in, and benefit from, the Defendants' educational programs and activities.

150.     As a direct and proximate result of Defendants' violations of Title IX, Plaintiff suffered damages and continues to suffer damages.

## COUNT III:
### Deliberate Indifference to Sexual Harassment
### 20 U.S.C. § 1681 *et seq.*
### <u>(Against All Defendants)</u>

151.     Plaintiff incorporates all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

152.     J.H., J.E., J.R., C.A., and T.N. engaged in sexual harassment and/or sexual misconduct based on gender and were directed at Plaintiff because of his gender.

153.     Plaintiff reported the sexual misconduct to the College's officials, and given the known circumstances, Defendants acts and omissions in response to those reports constitute deliberate indifference to student-on-student sexual harassment in violation of 20 U.S.C. § 1681 *et seq.*

154.     Defendants' deliberate indifference caused Plaintiff to forgo classroom instruction and extracurricular activities, thereby limiting his ability to participate in, and benefit from, the Defendants' educational programs and activities.

155.     Even though Florida College was notified of its shortcomings as it relates to its duties under Title IX, Defendants continued to take no affirmative action.

156.     As a direct and proximate result of Defendants' violations of Title IX, Plaintiff suffered damages and continues to suffer damages.

## COUNT IV:
### Negligent Hiring, Retention, Supervision
### <u>(Against All Defendants)</u>

157.    Plaintiff incorporates all previous paragraphs and allegations as if fully rewritten and replead herein and further states as follows.

158.    At all relevant times, Defendants had an obligation and/or duty to hire qualified individuals, properly train employees to comply with, among other laws, Title IX, and to supervise/ensure that employees were complying with federal law, as well as Florida College policies regarding responding to misconduct.

159.    Defendants failed to hire employees who were qualified in recognizing sexual misconduct and/or harassment and failed to hire employees who were qualified in responding to episodes of sexual misconduct and/or harassment.

160.    Defendants failed to train employees on how to recognize sexual harassment and/or misconduct and failed to train employees on how to respond to sexual harassment and/or misconduct.

161.    Defendants failed to take any steps to train employees on complying with Title IX and failed to take any steps to ensure that employees were complying with federal law, such as Title IX, as well as Florida College's policies about responding to misconduct.

162.    Defendants also failed to take any steps to investigate, report, stop, or prevent further sexual harassment and/or harm to Plaintiff after being notified about the harassment.

163.    As a direct and proximate cause of Defendants' negligence and/or recklessness in its hiring, retention, and/or supervision, Plaintiffs have suffered, and will continue to suffer damages.

**COUNT V:**
**Intentional Infliction of Emotional Distress**
**(Against All Defendants)**

164.    Plaintiffs incorporate all previous paragraphs and allegation as if fully rewritten and replead herein and further states as follows.

165.    As contained herein, Defendants repeatedly violated Plaintiff's rights under Title IX, made false and fraudulent misrepresentations, knowing their statements were false. Through their acts and omissions, Defendants forced Plaintiff to leave the College, causing him severe mental distress.

166.    Defendants acted intentionally and/or recklessly and knew or should have known that their actions and/or inactions could and/or would result in severe emotional distress to Plaintiff.

167.    All Defendants' acts and/or omissions, as described above, were so extreme and outrageous as to exceed the bounds of decency and are completely intolerable in a civilized society.

168.    Plaintiff's injuries and psychological injuries proximately resulted from the actions or inactions of all Defendants.

169.    Plaintiff has suffered mental anguish that is serious and of a nature that no reasonable person could be expected to endure it.

170.    Defendants' acts and/or omissions caused Plaintiff pain and suffering including, but not limited to, humiliation, depression, educational impacts, anxiety, and fear.

171.    As a direct and proximate result of Defendants' violations of Title IX, Plaintiffs suffered damages and continue to suffer damages.

## COUNT VI
**Breach of Contract**
**(Against All Defendants)**

172.    Plaintiff repeats and realleges each and every allegation set forth above as if fully rewritten herein.

173.    At all relevant times, a contractual relationship existed between Plaintiff and Florida College.

174.    The promises contained in Florida College's Handbook are legally binding obligations.

175.    Defendants were required to act in accordance with the University's written policies and procedures in investigating and adjudicating reports of alleged violations of student conduct standards.

176.    Based on the facts and circumstances set forth in this Complaint, Defendants materially breached its express and/or implied agreements with Plaintiff by failing to comply with its obligations, standards, policies, and procedures in the course of the disciplinary proceedings against the Offenders.

177.    In its Policy and Handbook, Florida College promises, among other things, that it will:

    a.   Incorporate the protections afforded by Title IX of the Educational Amendments of 1972;

    b.   Incorporate the requirements of any other state and federal law prohibiting discrimination;

    c.   Make every effort to ensure a fair outcome in disciplinary proceedings;

    d.   Render all decisions made in disciplinary cases in good conscious;

    e.   Investigate claims expeditiously;

    f.   Conduct an investigation that is thorough, reliable and impartial, and entails interviews with all relevant parties and witnesses, obtains available evidence and identifies sources of expert information, if necessary.

g. Investigate by taking the following steps:

    i. Inform the complainant and respondent of the alleged policy violation and initiation of a formal investigation;

    ii. In coordination with campus partners, initiate any necessary remedial actions;

    iii. Commence a thorough, reliable and impartial investigation by developing a strategic investigation plan, including a witness list, evidence list, intended timeframe, and order of interviews for all witnesses and the respondent; and

    iv. Provide regular updates to both the complainant and respondent, as appropriate, throughout the investigation.

h. The College further promises that it is "committed to ensuring that its resolution processes are free from actual or perceived bias or conflicts of interest that would materially impact the outcome."

178. Defendants materially breached its obligations when it, as contained herein:

a. Refused to timely investigate and adjudicate Plaintiff's Complaint;

b. Pressured and/or coerced Plaintiff into accepting informal resolution;

c. Allowed members with conflict of interest to be critical in the process;

d. Made knowingly fraudulent promises to Plaintiff that this matter would be better handled by the discipline committee process, that Defendants believed Plaintiff, and that if Plaintiff accepted informal resolution, the Offenders would be sufficiently punished;

e. Failed to provide regular updates to Plaintiff;

f. Failed to commence a thorough, reliable and impartial investigation; and

g.   Failed to enact initiate appropriate remedial measures.

179.   Plaintiff fully complied with his contractual obligations to the College.

180.   As a direct, proximate, and foreseeable consequence of Defendants' breach of its express and/or implied contractual obligations, Plaintiff sustained significant damages, including, without limitation, pain and suffering, humiliation, depression, educational impacts, anxiety, and fear.

181.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants as follows:

A.   Award Plaintiffs compensatory damages in an amount to be shown at trial;

B.   Award Plaintiffs punitive damages in an amount to be shown at trial;

C.   Award Plaintiffs reasonable attorneys' fees, costs, and disbursements;

D.   Award Pre and post judgement interest; and

E.   Grant Plaintiffs such additional relief as the Court deems just a proper.

Respectfully Submitted,

/s/ Fabiola A. Galguera
Fabiola A. Galguera (#1033393)
NACHTLAW, P.C.
501 Avis Drive, Ste 3
Ann Arbor, Michigan 48108
T: (734) 663-7550
fgalguera@nachtlaw.com

Eric F. Long (0093197) (Pending Special Admission)
Tyler J. Walchanowicz (0100115) (Pending Special Admission)
Friedman Nemecek Long & Grant, L.L.C.
The IMG Center
1360 E. 9th Street, Suite 650
Cleveland, OH 44114
T: (216) 928-7700
F: (216) 820-4659
efl@fanlegal.com
tjw@fanlegal.com

Dated: July 3, 2024